JAMES D. CLEVENGER, LEON H. CLEVENGER and M. A. HUTCHINGS (PLAINTIFFS), RESPONDENTS, v. EMERSON McAFEE, J. A. CHRISTENSEN, PEARL DUNCAN AND H. A. O'DELL, (DEFENDANTS), APPELLANTS, FRANK WILSON AND J. H. SISK, (INTERVENORS), APPELLANTS.—170 S. W. (2d) 424.

Kansas City Court of Appeals. April 5, 1943.

1078

*Thompson & Thompson* for appellants.

*Robert Moore* and *Richard Moore* for respondents.

CAVE, J.—This suit is brought by plaintiffs as trustees of the New Garden Baptist Church, in Ray County, to restrain the defendants, their agents and representatives, and all persons claiming by or under them, from entering upon and taking possession of or attempting to take possession of a certain church house and the property on which it is located. On the filing of the petition, a temporary restraining order was issued and in due time the cause was tried on the merits and the court granted permanent injunction against the defendants and the intervenors who duly perfected their appeal.

The petition charged in substance that the plaintiffs are the duly elected, qualified and acting trustees of New Garden Baptist Church and as such trustees have exclusive right, title and interest in and to certain real estate therein described on which is located the church house; that said church is an unincorporated, voluntary association, with regularly adopted rules, by-laws and provisions for self-government; that the defendants on or about March 15, 1941, without the consent of the plaintiffs or of said New Garden Baptist Church, and contrary to and in violation of the rules, by-laws and articles of government of said church, did forcibly enter upon said real estate and upon and into the building thereon situate, and did violently and in a disorderly manner attempt to appropriate to themselves and use the church house to the exclusion of and against the will of the members of said New Garden Baptist Church, for whom these plaintiffs hold

title to and possession of said property and building; that said defendants, although not members of said church, did threaten and assert that they will continue to so unlawfully, forcibly, and without consent enter upon said property and enter upon and into said building, and that the said defendants further threaten and assert that they will continue to permanently further deprive plaintiffs and the members of said church from the use of said premises and said building; that plaintiffs fear that said defendants will carry out their threats unless restrained by the judgment of the court; that if defendants so continue such trespassing and unlawful acts as aforesaid, the plaintiffs will suffer an irreparable injury; that defendants will vex, harass and annoy plaintiffs and the members of said church and will put plaintiffs to the necessity of bringing a multiplicity of actions to protect their rights; that defendants are insolvent and that plaintiffs have no adequate remedy at law.

After the filing of the petition, one Frank Wilson and J. H. Sisk filed their application to intervene in said cause, alleging that they were two of the three regularly elected, qualified and acting trustees of said church. Their application was sustained and they were permitted to intervene in said cause. As intervenors, they filed answer denying the allegations in plaintiffs' petition, and further answered, claiming that they were the duly elected, qualified and acting trustees of said church; that they were a majority of the trustees of said church and as such trustees have exclusive right, title and interest in and to the property described in the petition; that the plaintiffs and their followers conspired and contrived to deprive the intervenors of their office as trustees and attempted to remove them contrary to the rules and customs of said church; that plaintiffs' and their followers' actions were contrary to the rules and customs of said church; that the meetings at which plaintiffs attempted to remove the intervenors as trustees were held contrary to the rules and customs of said church and that the plaintiffs were without right or authority to prosecute this suit; that the intervenors had not consented, authorized or acquiesced in the filing or prosecution of said suit.

The answer of the four defendants was to the same effect.

The reply puts in issue the question of who are the legal trustees of said church.

It is conceded that the New Garden Primitive Baptist Church is an unincorporated, voluntary, religious association organized for the sole purpose for the worship of God, and that said church is congregational in its nature and was built exclusively by the will of its members in good standing, with no superior or directing power other than found in the government of the church by its own members, through rules, by-laws, practices and customs of said church. There were about 156 members at the time of this controversy.

The Rules of Decorum of the church were introduced and the pertinent parts are substantially as follows: The business of the church is to be attended to on the third Saturday in each month commencing at eleven o'clock; a moderator shall be chosen by a majority of the members present, who shall preside while the church is on business and shall preserve order; he shall take the vote of the church, and all business of the church shall be done by majority of the members present except the choice of church officials and the admission of members, in which case the church shall be unanimous; a departure from the articles of faith and Rules of Decorum is a sin against the church for which it has the right to require satisfaction and failure to comply shall cut the dissenter off from all right to the records and any other property belonging to the church.

The evidence discloses that friction developed in the membership of the church in the fall of 1940 and grew with intensity at each business meeting thereafter until it culminated in this suit. The trouble did not involve any question of creed, but appears to be solely friction between individual members of the church.

The first vital questions for our decision is, who were the duly elected and qualified trustees of the church at the time of the filing of this suit?

It appears from the evidence that there were three trustees elected by the church who held the title and were charged with the duty of preserving and caring for the property belonging to the church. It is not clear from the evidence whether the trustees were elected for a definite period of time or whether, when elected, they served until death or resignation or expulsion. It is in evidence that at the beginning of this trouble, Frank Wilson, J. H. Sisk and Joe M. Siegel were the trustees. The cause of the friction and ill feeling in the congregation is not clear. It seems to have stepped out of the shadows of the past, full grown. It is clear that defendant McAfee was the leader of one faction and Leon Clevenger the leader of another. Over a period of four or five months the factional dispute became more spirited, and at the business meeting of the church on the third Saturday in March, 1941, the matter reached a climax. At this meeting there were approximately 70 members of the church present. A motion was made that Elder Clevenger be elected as moderator as provided for by the rules. A vote was taken and about 40 members voted favorably and no one against. Before Clevenger could take charge of the meeting as moderator, defendant McAfee went to the platform and announced to the congregation that he had been elected moderator some three or four years before, and "he was going to moderate." He asked how many would stand with him, and twenty-six or twenty-seven members indicated their willingness to support him. Considerable confusion ensued and Clevenger undertook to read a resolution but was told by the moderator to "shut up and sit down". During

the confusion many members undertook to be heard, but were not able to express their views. Finally, Clevenger prevailed upon the congregation to remain quiet and permit McAfee to proceed until he had completed his part of the program or meeting, and then a meeting would be held to transact the business of the church. McAfee preached for a short time, and then the McAfee faction elected defendant O'Dell as a trustee in place of Siegel, and McAfee and his followers left the church building. From vote taken by the congregation that day, the evidence discloses that 40 members voted in favor of Clevenger and 27 for McAfee. In other words, a majority of those present were opposed to the actions taken by McAfee and his minority group.

After the McAfee faction had left the church, Clevenger acted as moderator and those present, some 40 or more, voted unanimously to remove J. H. Sisk as trustee and elected Dan O'Dell in his stead. That meeting also adopted a resolution declaring nonfellowship with the defendants and dropping them from membership in the church and denying to them the right to the church property, books, records, etc. The resolution reviewed at some length the prior friction in the church and charged that the defendants herein had refused to abide by the wishes of the majority, as required by the rules, and they should be expelled from the church, under the Rules. The resolution also authorized the calling of a special meeting of the membership during the next month to transact any business that may come before such special meeting. A special meeting was held on April 8, 1941, and at that meeting, Dan O'Dell voluntarily resigned as trustee, and those present unanimously elected James D. Clevenger; also Joe Siegel voluntarily resigned and Marion Hutchings was elected. Both O'Dell and Siegel testified at the trial that they voluntarily resigned and were favorable to this suit being filed. The legality of these elections is disputed by the defendants and intervenors, which will be later discussed. At the special meeting on April 8th, those present also adopted a resolution authorizing the trustees to take such legal steps as necessary to restrain the defendants from interfering with the property and services of the church. On April 15th the petition before us was filed and the temporary restraining order issued.

The defendants and intervenors make fifteen assignments of error, but in their points and authorities these are consolidated and reduced to nine, which are discussed in the argument.

The first point urged is that "power of the courts to issue injunctions should be exercised with great caution and only when the reasons and necessity therefor are clearly established." [Citing, Godefroy Mfg. Co. v. Lady Lennox Co., 134 S. W. (2d) 140.] That is a correct statement of the general policy of the law, but in the case of Fulbright et al. v. Higginbotham, 133 Mo. 668, the Supreme Court specifically held that injunction was a proper remedy "to settle the rights of two discordant factions of the congregation in respect to

their rights to use and control of the church property". [Citing, 1 High on Injunctions, sec. 305; Prickett v. Wells, 117 Mo. 503; Watson v. Jones, 13 Wall. 679.] To the same effect is the holding in Turpin v. Bagby, 138 Mo. 7.

The next point urged is that "the courts have invariably refused to issue an injunction when its only function would serve to allay fears." [Citing, Dennig v. Graham, 227 Mo. App. 717; Putnam v. Coates, 283 S. W. 717.] Defendants and intervenors argue under this point that the evidence is not sufficient to justify fears, much less showing a reasonable probability of injury to plaintiffs or any one else connected with this church. We cannot agree to that position. Without lengthening this opinion by relating the various controversies and conflicts which had existed at each business meeting for some four or five months prior to the March and April meetings, we have concluded that the evidence justified the trial court in deciding that these controversies were increasing with intensity and that it was proper for the court to exercise its authority in restraining, what appears from the evidence, the leaders of a minority group of the membership of such church from exercising dominion over the property of the church.

The next point urged is that "it has been the universal rule that an injunction will not issue to restrain the doing of an act already done." [Citing, Corken v. Workman, 231 Mo. App. 121; Lademan v. Lamb Construction Co., 297 S. W. 184.] From this broad premise, defendants and intervenors argue that there is no evidence in the record that they or any one of them, after the March meeting, ever attempted to officiate as a moderator or do any other act to deprive the plaintiffs or the members of the church from using the building. But it must be kept in mind that within one week after the April meeting, the lower court had issued a temporary restraining order which prevented the defendants and intervenors from doing anything to obstruct the use of the church property by the membership thereof and the fact that they had complied with that proper order would not tend to prove or disprove their intentions and purposes, had such order not been issued; and it certainly does not destroy the effect of the evidence that at each business meeting for some five months prior thereto they had committed acts which interfered with the peaceful use of said property by the majority membership. There is no merit in this contention.

The next contention is that the burden of proof rests on the plaintiffs to show their right to an injunction and that the evidence in this case fails to meet that requirement. The pith of the argument on this point is that the plaintiffs, having singled out the defendants from the rest of the McAfee faction, must prove the specific acts and conduct of each defendant which would show the defendants guilty as charged in the petition; that it is not sufficient to convict the defendants of misconduct where the only evidence offered is that that par-

ticular faction created the disturbance. The evidence discloses that at the January, 1941, business meeting, defendant H. A. (Aaron) O'Dell offered a resolution condemning plaintiff Leon H. Clevenger and his followers for certain conduct and concluding, "Therefore, for contempt of church and disorderly conduct, we the church, declare non-fellowship to Elder L. H. Clevenger and his followers." When the motion was put to adopt this resolution there were only four members voted in favor of it, two of whom were defendants Jesse Christensen and Pearl Duncan. There were some twenty members in the congregation at that time. Thereafter, O'Dell announced he would appoint J. A. Christensen moderator of the meeting, and he made an effort to secure the moderator's stand, but it wasn't given him. At the suggestion of the regularly elected moderator, Clevenger, that controversy was passed with the hope that by private discussion the troubles could be quieted. But at the February meeting, it appears that the same controversy arose and caused considerable discussion and further ill feeling between the factions. The developing controversy culminated in the open, and somewhat disorderly, break at the March meeting. It is clear from a reading of this record that each of the four defendants was, to a varying degree, the agitator and leader of the minority faction, and we cannot say that the evidence is insufficient to justify the trial court in making permanent the restraining order against them. Defendants' counsel very ably and sincerely argues the evidence and construes it favorably to the defendants, but the trial judge saw the witnesses and observed their demeanor on the witness stand and we defer to his construction and interpretation of the evidence, although under the law we are not required to do so.

Defendants argue that there is no authority for calling the special meeting held on April 8th. The record does not disclose any rule of the church prohibiting special meetings, and the resolution adopted by the majority members on March 8th authorized a special meeting to be called and the evidence discloses that it was called and that notice was given to some thirty members or more. Under the state of the record in this case, we cannot declare the special meeting illegal. This church and its affairs are controlled entirely by the majority of the membership and any voluntary association, such as this, being bound together by what might be called a rope of sand, and not subject to the rule, regulation or control of any other or higher church authority may hold such meetings and at such times as the majority of the members present may authorize. Concerning such church organization as this, the United States Supreme Court, in Watson v. Jones, *supra,* said:

"If the principle of government in such cases is that the majority rules, then the numerical majority of members must control the right to the use of the property. If there be within the congregation officers in whom are vested the powers of such control, then those who

adhere to the acknowledged organism by which the body is governed are entitled to the use of the property. The minority in choosing to separate themselves into a distinct body, and refusing to recognize the authority of the governing body, can claim no rights in the property from the fact that they had once been members of the church or congregation."

Defendants and intervenors also argue that the trustees who were removed at the March and April meetings were not served with any notice of the congregation's intention so to do. This record is devoid of any evidence concerning the manner of electing trustees or the term for which they shall be elected or the manner in which they may be removed. In fact, there is no rule or by-law or deed or other written instrument in the record providing for any trustees for the church; however, it seems to be conceded by both sides that by custom and practice, the property and affairs of this particular church have been lodged with three trustees. Under such circumstances, it seems to be the general rule that a trustee may be replaced at the will of the majority of the congregation. In 54 C. J., page 25, sec. 48, it is said:

"In societies having a congregational form of government, trustees, even where their tenure has been fixed, hold office subject to the discretionary power of the majority to terminate their holding at any time and to appoint successors, and the subsequent ouster or removal of their successors does not entitle the old officers to hold over . . .

"(Sec. 49) The right to remove an officer of a religious society depends upon the terms of the governing statute, charter, by-laws or custom and of the original compact as exemplified by the form of church government which the society has adopted, or of a deed of trust constituting the organic law of the church where such deed exists. *In churches having the independent, congregational form of church government, the congregation has the right to remove at any time regardless of the term for which the officer has been elected or appointed.* . . .

"(Sec. 50b) In churches of the congregational type, the congregation's power by a majority vote to remove is discretionary, and may be exercised at any time and upon any grounds not malicious, whimsical or capricious." (Italics ours.)

These general principles seem to be in accord with views expressed by the Supreme Court in the case of Dudley v. Clark, 255 Mo. 570. We might add that the defendants and intervenors seem to have recognized the above principles because at the March meeting, when their faction was definitely in the minority of the membership present, they undertook to, and according to the minutes of their minority meeting, did remove one of the trustees who belonged to the opposite faction and elected one of their own in his stead, and that trustee, J. H. Sisk, is intervening in this cause and claiming to be a duly elected trustee of said church under such circumstances. Furthermore, the

record discloses that at the time of, and for some time prior thereto, Joe Siegel was a trustee, regularly elected, and at the April meeting he voluntarily resigned and plaintiff Marion Hutchings was unanimously elected to fill the vacancy. Siegel is not questioning the legality of his resignation and the defendants are not in position to do so. At the regular business meeting in March, the membership present voted to remove J. H. Sisk as trustee and elected Dan O'Dell as his successor. Sisk was at that meeting and had taken an active part in the actions of the minority and cannot now complain of the action of the majority, even though he saw fit to walk out of the church before he was removed as such trustee. Clearly, under the evidence, plaintiffs Hutchings and James D. Clevenger were duly elected trustees at the filing of this suit and therefore constituted a majority of the board of trustees. The defendants offered no evidence, and the only evidence offered by intervenors was the testimony of Frank Wilson to the effect that he had not resigned as trustee. Whether he had resigned or not is not material, as we conclude he was properly removed; and certainly a majority of the duly elected trustees authorized this action.

It is clear from a reading of this record that the three plaintiff trustees represent the wishes of the majority of the membership of the church as expressed by those attending all of the meetings beginning in October, 1940, and culminating in the final meeting of April 8, 1941. This being a controversy over the use of the property of the church and not over a matter of creed, faith or belief, the court has jurisdiction to determine and settle the property rights involved. [Fulbright v. Higginbotham, *supra*.] That is the only question we are deciding.

It is next contended that the plaintiffs must plead and prove inadequacy of remedy as well as irreparable damage and that the evidence in this case fails to support either proposition. Without again reviewing the evidence concerning this controversy, we hold that there is no merit in this contention. It is in evidence that the controversy among the members of the church had reached such a sad state of affairs that an officer of the law, the constable of the township in which the church was located, was called in to preserve peace. He attended the March meeting and testified that there was considerable confusion and dispute between the two factions, but not sufficient violent to, in his opinion, call for his interference. As to what occurred at that meeting, his testimony corroborates all of the evidence offered on behalf of the plaintiffs.

From a careful reading of this record, we conclude that the disrupting influences are very largely due to the actions of two or three preachers of this church, and that certain members have become too ardent followers of a preacher instead of the teachings of their pro-

1088

fessed religion. It is to be hoped that a final disposition of the case will bring some peace and harmony to the membership.

Finding no reversible error, the judgment should be affirmed. It is so ordered. All concur.