Thayne FAST et al., Respondents,

v.

Robin SMYTH et al., Appellants.

Raymond DICKEY and Alice Dickey et al., Appellants,

v.

Rev. Thayne FAST et al., Respondents.

No. KCD 26,993.

Missouri Court of Appeals, Kansas City District.

Sept. 2, 1975.

James A. Christenson, Independence, for appellants.

Charles M. Warner, Kansas City, for respondents.

Before SWOFFORD, P. J., and WELBORN and HIGGINS, Special Judges.

SWOFFORD, Presiding Judge.

This litigation stems from a struggle for control of the property and affairs of the Free Will Baptist Church of Kansas City, Missouri, between two factions of its congregation. One of these groups, led by Thayne Fast, who claims to be the present pastor of the church, will be hereafter referred to as the "Fast" group. The other group, led by Raymond Dickey, the senior deacon of the church, and his wife, Alice Dickey, former pastor emeritus and who claims to be the lawfully elected present acting pastor of the church, will hereafter be referred to as the "Dickey" group.

The exact legal status of the church organization remains somewhat obscure from the record. The First Free Will Baptist Church was founded by Alice Dickey in 1948, as a voluntary religious association. In 1963, three members of the church organized a not-for-profit corporation, named the "Kansas City First Free Will Baptist Church", and a charter was issued by the Secretary of State of Missouri. Except for the payment of the annual registration fee, the record shows that this corporation never functioned as a corporate body. The church property was never deeded to it; no officers or directors were ever elected; no bank account established; and, the minutes and official records of the church generally refer only to the name "Free Will Baptist Church". However, all parties to the litigation agreed that the Constitution, By-Laws and Minutes offered and received in evidence were those in effect and pertinent under which all parties operated and which controlled their rights and obligations during the times involved. The court below made no finding as to whether or not the church was operated as a corporation, and no such finding is necessary here. The records, evidence and admissions of the parties justify the assumption that the functioning church structure was in fact not changed by the issuance of the corporate charter, and that the church proceeded to function as a voluntary, religious association, as it had since 1948. The entity of such organization will be hereinafter referred to as the "Church".

Long prior to the difficulties giving rise to this litigation, the Church, as an autonomous, self-governing, religious congregation, had affiliated with the Central Western Missouri Association of Free Will Baptists (hereinafter referred to as "Association") which, in turn, was affiliated with the State and National Associations of Free Will Baptists. The Association had no authority to interfere with the internal affairs of local churches, but it did create a board within its organization known as the Missouri State Home Mission Board of Free Will Baptists (hereinafter referred to as "Board") which, upon request of a church in financial trouble and an agreement by such church to assume "Mission status", could

take over the management and trusteeship of such church with the objective of rehabilitation of its affairs toward an eventual return to independent church status.

By becoming affiliated with the National Association, the Church accepted and became bound by "A Treatise of the Faith and Practices of the Original Free Will Baptists", pertinent parts of which will be hereafter noted and referred to as the "Treatise".

On April 6, 1973, the "Fast" group instituted an action in the court below, Case No. 768131, for a temporary restraining order and for a permanent injunction against the "Dickey" group. In summary, it was alleged in this suit that at a regular monthly business meeting of the Church, held on March 4, 1973, a resolution was passed to transfer the trusteeship and authority of the trustees of the Church to the Board; that the Board accepted such trusteeship and authority and requested the Church to continue to hold Sunday services with Thayne Fast as Pastor and Minister; and, that the Dickey group had physically prevented him from doing so, against the wishes of the majority of the congregation. The Fast group sought injunctive relief to prevent such interference. A temporary restraining order was granted in accordance with the prayer of the petition.

On the same day, April 6, 1973, the Dickey group filed suit for a restraining order and injunction against the Fast group in the Circuit Court, there being numbered 768151, alleging, in substance, that the act of the latter group on March 4, 1973, in turning over the affairs of the Church to the Board, was illegal and void under the Constitution and By-Laws of the Church; that this action had been rescinded by legal action of the membership on March 5, 1973, and the resignation of Thayne Fast as Pastor had been accepted on that date; that the Fast group has disregarded such legal action and, under the authority of the Board, has continued to exercise control over the property and religious services of the Church; that the Fast group has disre-

garded a petition of March 22, 1973, of the membership, protesting transfer to the Board, and refused to allow the membership to hold its regularly scheduled business meeting on April 1, 1973, but that nevertheless such business meeting was held with 18 members of the Church present; that at this meeting the action of the Fast group of March 4, 1973, turning the affairs of the Church over to the Board, was again rescinded and the services of Thayne Fast as Pastor again terminated; that the Fast group had refused to turn the property and affairs of the Church over to the Dickey group or permit it to hold religious services; that numerous members have refused to attend or function as part of the congregation so long as the Fast group remains in control, to the financial detriment of the Church; and, that the Church is an autonomous congregational church and a member of the Association, but that the Fast group has completely ignored the advice and counsel of the Association in its purported action to dissolve the Church and turn its affairs over to the Board. The petition requested that the Fast group be enjoined from further exercise of control, direction or administration of the affairs of the Church. A temporary restraining order was issued in the Dickey case by the court to this effect on April 6, 1973. The Dickey group filed an amended petition in its action on April 13, 1973, substantially the same as above summarized, adding additional parties as defendants.

On April 18, 1973, the Fast group filed its motion to dissolve the restraining order and to dismiss the petition in the Dickey injunction suit. These motions were overruled on April 25, 1973, and the two suits, No. 768131 and No. 768151 were consolidated for trial.

After an evidentiary hearing and on April 26, 1973, the court entered a preliminary or temporary order holding that both of the business meetings of March 4, 1973 (the Fast meeting transferring the affairs of the Church to the Board) and the March 5, 1973 and April 1, 1973 meetings (the

Dickey meetings rescinding the actions of the Fast group on March 4, 1973) were not held in accordance with the by-laws of the Church and were null and void. The court's order further directed that a business meeting be held in accordance with the by-laws of the Church and upon proper written notice to the members to decide whether the transfer to the Board should be made. This temporary order further stated " . . . that all members of said congregation may attend the church service or business meeting and exercise full right of membership . . . "

Such a business meeting was held on May 6, 1973, at which meeting nine persons were not permitted to vote, and the result was declared to be fifteen votes for and thirteen votes against the transfer to the Board.

On May 8, 1973, the Dickey group filed a motion to show cause why Thayne Fast, who presided at the May 6th meeting, and Elizabeth Mason, who acted as clerk, should not be cited for contempt for violation of the court's order of April 26, 1973. The basis for this motion is the assertion that proper notices of the business meeting to be held May 6, 1973 were not sent to approximately fifteen members of the Church; some members were improperly excluded from the meeting; some eligible members were denied the right to vote; some votes were not counted; the right to speak against the proposal to transfer was denied; that a necessary two-thirds majority was required to amend the constitution and by-laws, and such vote was not obtained; and, that all of these procedures were in violation of controlling Church laws.

On June 11, 1973, the court held another evidentiary hearing with reference to the conduct of the May 6, 1973 meeting, and held that such meeting was valid and legally conducted. The court thereupon entered judgment in the Fast suit, No. 768131, granting a permanent injunction against the defendants (the Dickey group) from interfering with the resolution of May 6, 1973. It also entered a judgment against the plaintiffs (the Dickey group) in case No. 768151, denying injunctive relief. After an unsuccessful motion for a new trial, the Dickey group appealed from both judgments of June 11, 1973 to this court.

The Dickey group (appellants) assert two points upon which they seek reversal of this decision, which may be stated as follows: 1) that the trial court erred in holding that the nine members of the Church who were not permitted to vote at the May 6, 1973 meeting, were properly denied this right; that the status of such persons was an ecclesiastical matter to be determined by the Church and not the courts; that the May 6th meeting was conducted oppressively and illegally; and that they were thereby denied due process and deprived of their civil rights; and 2) that the court erred in denying the members the right to hold business meetings and the right to vote on church legislation in the future; that such action in fact amended the Constitution and By-Laws of the Church and therefore required a two-thirds affirmative vote of the Church members, which had not been obtained.

■ It is, of course, well established law that strictly ecclesiastical controversies are under the exclusive jurisdiction of ecclesiastical tribunals and decisions on such matters are binding upon and not reviewable by the civil courts. *Henson v. Payne*, 302 S.W.2d 44, 50[5] (Mo.App.1956); *Stone v. Bogue*, 238 Mo.App. 392, 181 S.W.2d 187, 190[3] (1944); *Williams v. Wilder*, 397 S.W.2d 696, 702[2] (Mo.App.1965). In *Henson v. Payne*, supra, it was held that the determination of who are qualified members of a church is an ecclesiastical matter (l.c. 51[13]).

■ There is, however, a well recognized exception to this general rule in this state. Civil courts will review ecclesiastical matters where necessary to protect the property, contracts or civil rights of members. *Stone v. Bogue*, supra; *Murr v. Maxwell*, 232 S.W.2d 219, 236[17] (Mo.App.1950). This exception to the general rule permits the court below (and this court on appeal) to inquire into whether the meeting of May

6, 1973 was properly called and conducted because at that meeting purported congregational action was taken with reference to the title, use or possession of church property. *Trett v. Lambeth*, 195 S.W.2d 524, 531–532[4] (Mo.App.1946); *Murr v. Maxwell,* supra; *Williams v. Wilder*, 397 S.W.2d 696, 703–704[7] (Mo.App.1965).

█ Under these authorities, the basic and dispositive matter as to appellants' first point is whether the nine persons who attended the May 6, 1973 business meeting ordered by the trial court were in fact members of the Church entitled to vote upon the transfer of the Church property and affairs to the Board, and were, therefore, wrongfully prevented from voting. To determine their status, resort must be had to the facts upon which they claim membership against the background of Church law, custom and usage. *Trett v. Lambeth*, supra.

The Constitution of the Church provides in Article III a broad general statement of the basic requirements of eligibility for church membership, premised largely upon a profession of religious faith and acceptance of the religious covenants of the Church, and baptism by immersion. A person then may be received as a member by a vote of the congregation. The By-Laws of the Church are silent as to the procedural rituals incident to membership.

However, the Church had accepted the dogma and tenets as contained in the "Treatise" referred to above. Part IV of this publication pertains to "The Practices of Free Will Baptists". Chapter I of this section pertains to "The Local Church", and Section VII of that chapter stated in part, as follows:

" * * *

Its Membership A. An individual may be received into the fellowship of a local church by decision of the congregation *according to its regularly prescribed method * * *"* (Emphasis supplied)

The procedures or "regularly prescribed method" followed by the Church in its acceptance of new members was shown by substantial evidence to consist of several steps. *One,* the pastor "opens the doors", that is, apparently an invitation or opportunity to apply for membership, and he counsels applicants on their faith and their understanding. *Two,* if they are not baptized, they are to be baptized. *Three,* they are read the Covenant of the Church and are required to accept the Covenant. *Four,* the Church congregation votes upon the applicant. *Five,* their names and addresses are then placed upon the Church membership rolls.

It was also established that persons who had fulfilled the other requirements for membership were usually voted upon by the congregation during or immediately after a regular Sunday service.

The record discloses that the nine persons who were not permitted to vote at the court-ordered meeting of May 6, 1973 were admitted to membership by that part of the congregation here referred to as the Dickey group at prayer meetings conducted by Mrs. Dickey as "Acting Pastor" by reason of appointment by the Dickey group on Monday, March 5, 1973, a meeting declared by the court below to be invalid. At the March 5, 1973 meeting, five new members were accepted; on Wednesday, March 7, 1973, one; on Friday, March 9, 1973, one; on Sunday, March 11, 1973, two; and a tenth new member was accepted on a date not shown on the record. Two of these persons were baptized by an outside pastor on April 10, 1973. There was evidence that some of the church members belonging to the Fast group were not notified of such meetings; that Thayne Fast and others, were excluded from at least one of these meetings, and Fast was bodily ejected from the Sunday, March 11, 1973 service.

None of the nine persons not permitted to vote on May 6, 1973 were ever enrolled as members on the Church books, though Mrs. Dickey testified she had given Thayne Fast

a list of their names and addresses and requested that they be so enrolled.

On April 29, 1973, a business meeting of the Church board was held, at which time it was decided to send the court-ordered written notices to only those persons enrolled upon the Church books as members, at their last known addresses, advising them of the court-ordered business meeting to be held Sunday, May 6, 1973. Fifty-eight such notices were sent, the meeting held, the nine new "Dickey" members (who were not formally notified but attended) were not permitted to vote, and the result was a vote of 15 to 13 for the transfer to the Board.

■ There is substantial evidence upon which to find that the purported congregational meetings of the Dickey group, at which the nine persons were admitted to membership, were not properly called and conducted, *Murr v. Maxwell*, 232 S.W.2d 219, 236[18] (Mo.App.1950), and such persons were not admitted to Church membership by the "regularly prescribed method" theretofore employed for that purpose. That being the case, it follows that their right to vote as members was properly denied.

■ Likewise, there was substantial evidence that the court-ordered meeting of May 6, 1973 was properly called and conducted within the guidelines declared by the court below in its temporary order of April 26, 1973.

As a part of their argument in support of the first point, appellants assert that the injunction upholding the May 6, 1973 action of the membership was "extremely harsh" and was clearly contrary to established law, in that there was no showing that the ecclesiastical proceedings to determine the standing of the nine excluded members had been followed and exhausted. There is no merit in this argument for the reason that the action of the Church board on April 29, 1973, deciding that notices of the court-ordered business meeting to be held May 6, 1973 be sent only to those persons enrolled on the Church books as members was fol-

lowed and ratified by a majority of the enrolled members in attendance at the May 6, 1973 meeting. Also, the final injunction issued by the court was couched in the only terms possible, namely, enjoining the Dickey group from interfering with the resolution of May 6, 1973, turning the Church affairs over to the trusteeship of the Board.

The cases cited by the appellants in support of their first point have been carefully studied and are clearly distinguishable on the facts, correctly state general principles of law equally applicable here, and are not persuasive toward any conclusion other than the one here reached. There is no merit in appellants' first point.

■ The appellants' second point presents a difficult and perplexing problem, which, as far as the briefs and independent research by this court discloses, has no precedential guidelines. They assert error by the court below in denying the Church members the right to hold business meetings and vote on "legislation" during the trusteeship of the Board. They claim that such a deprivation of power abrogates the provisions of the Church Constitution and By-Laws, which would require a two-thirds majority vote of the members.

The evidence adduced below was that the Board here involved was authorized and established under the broad general power granted to the Missouri State Association of Free Will Baptists to establish such boards, committees and commissions, as are required in its operation. The Board is an integral part of the Association's structure. However, there was no evidence (other than oral testimony) as to the Board's powers, composition or functions; no proof of written rules or regulations governing its operation; and, even more important, no proof of any standard rules or regulations defining the restrictions upon or obligations of a church coming under trusteeship of the Board.

Cliff Bowman, a director of the Board, and Lawrence D. Thompson, its Secretary-

Treasurer, testified as witnesses for the Fast group. Bowman testified that the above elements of proof were defined under written documents of the State Association, although none such were produced. Thus, there is a gap between the written laws of the Church and those contained in the National Association's "Treatise". No objection was made as to the oral testimony of Bowman and Thompson, however, and no evidence in conflict therewith was adduced.

For the purposes of this appeal, the following facts must be deemed as established.

The basic church law (the "Treatise" hereinabove referred to) clearly recognizes the independence and autonomy of the individual churches. Part IV, Chapter I, Section 1B, states:

"The local church is an independent and self-governing body, with full authority to transact its business, choose its pastor and officers, receive discipline, and dismiss members, hold free title to all its properties, and conduct all its internal affairs."

Chapter III, Associations of Churches, Section I, describes the associations of a local church with the state and national as strictly "voluntary, both at the beginning and in their continuation", and states, "The local church remains at liberty to withdraw from the association it has voluntarily joined." Section IV A-1 of the same Chapter of the "Treatise" states:

"The association has no authority to interfere in the internal affairs of the local church. (see Chapter One, Section I-B)."

Bowman and Thompson both testified in effect that these provisions were inapplicable to the operation of the Board. The Board's function is to come to the assistance of local churches that are in financial difficulty *upon request of such churches.* The Board assumes and pays the debts of such churches; appoints a pastor to handle both the ecclesiastical functions and to work toward increased membership and other organizational needs; and the Board manages all the secular affairs of the church during the trusteeship. When the affairs of the church are in order, according to the judgment of the Board, the local church organization resumes its control over such affairs.

The Board does not inject its control and function except upon proper request from the local church and, so far as this record discloses, there are only two conditions imposed. It is required that the church assume "Mission status" during the trusteeship, which simply means that the affairs of the church theretofore controlled by its local organization come under the directorship of the Board during the period.

During this period of trusteeship, according to the testimony of Bowman and Thompson, no business meetings of the Church are held unless that privilege is granted by the Board. There is a basic and logical reason for this since the function of the Board and of the regular business organization of the Church would overlap and perhaps conflict, to the detriment of the efforts toward salvage and rehabilitation of the church affairs.

The other condition of the trusteeship is that the time when the Church affairs are returned to the Church organization is to be determined solely by the Board.

There can be no valid dispute that at the times here involved the affairs of the Church were in bad, if not desperate, condition. There were only 58 members enrolled on the Church records, some active and some inactive; the average church attendance at regular services was from 15 to 20 persons; there was a bonded indebtedness on the church property of $20,000 to $28,-000; there was an unpaid special sewer tax bill in the amount of approximately $8,000; the general weekly operating cost was several hundred dollars; and, on May 6, 1973, the date of the court-ordered business meeting, the minute book shows there was $168.57 in the Church treasury.

The testimony of Thompson and Bowman was that the Board had been approached by Reverend Fast and Deacons Mason and

Rhoades to have the Board assume trusteeship; that the Church officials were advised of the conditions; that following the March 4, 1973 meeting (later declared invalid by the court below) the Board had agreed to the trusteeship and had also agreed thereto following the May 6, 1973 meeting; had assumed the debts and obligations of the Church; and, had made arrangements for Fast to stay on as Pastor until a permanent pastor could be appointed (which had apparently been tentatively accomplished pending the outcome of this litigation at the time of the last court hearing below).

Having ruled that the May 6, 1973 meeting was valid, it necessarily follows that the action of the Church in determining to turn its affairs over to the trusteeship of the Board was a *voluntary act and decision*, and was not in any way imposed or coerced by the Board. Thus, the authorities and arguments of appellants, that the relationship between members of a voluntary association are contractual and their rights thereunder may not be unlawfully impaired or denied are inapplicable under the facts in the case at bar, and the civil rights of the minority Dickey group were not violated or impaired. Neither would the trusteeship constitute any amendment to, or repeal of, the Church Constitution or By-Laws and thus require a two-thirds vote by the members. Rather, as held by the court below, the provisions of those Church laws would be temporarily suspended during the period of trusteeship.

Nothing said herein is to be considered a holding by this court that the rules of law applicable to trust relationships generally and the duties and obligations of trustees do not apply to the existing relationship between the Board and the Church. Nothing in this record reveals that the actions of the Board or its intended functions can be attributed to bad faith or impropriety, and such will not be implied as to its motives.

Nothing appears except that the Board is motivated by a good faith effort to aid in solution of the Church's problems and its fiscal rehabilitation. It is to be hoped that with a new pastor and the guidance of the Board, the intra-congregational frictions will dissolve and the control of its affairs can be turned back to the Church in the near future.

For the reasons herein stated, the judgment is affirmed.

All concur.